UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PHILLIP STREHLE,

                    Plaintiff,                Civil Action No. 17-11764
                                                    Honorable Nancy G. Edmunds
v.                                            Magistrate Judge David R. Grand

CITIMORTGAGE, INC., GREEN TREE
SERVICING LLC n/k/a/ DITECH FINANCIAL
LLC, DITECH FINANCIAL, LLC, and
MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC.,

                    Defendants.
_____/

## REPORT AND RECOMMENDATION TO GRANT DEFENDANT CITIMORTGAGE INC.'S MOTION FOR SUMMARY JUDGMENT [18], DEFENDANT DITECH FINANCIAL LLC'S MOTION FOR SUMMARY JUDGMENT [21], AND MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC.'S MOTION FOR JUDGMENT ON THE PLEADINGS [22]

Plaintiff Phillip Strehle ("Strehle"), an attorney, brings this action *in pro per*. Defendants

CitiMortgage, Inc. ("CMI"), Green Tree Servicing LLC ("Green Tree"), DiTech Financial, LLC

("DiTech"), and Mortgage Electronic Registration Systems, Inc. ("MERS") (collectively,

"Defendants") are entities that, at one time or another, were affiliated with a mortgage obtained

by Strehle.[1]  Strehle filed his complaint in the State of Michigan's 52nd District Court on May 5,

2017.  (Doc. #1 at 9-42 ("Compl.")).  DiTech and MERS timely removed the case to federal

court on June 5, 2017.  (Doc. #1).  CMI and DiTech filed motions for summary judgment on

January 11 and 15, 2018, respectively.  (Docs. #18, #22).  MERS filed a motion for judgment on

the pleadings on January 15, 2018.  (Doc. #21).  Strehle responded to each of these motions.

---

[1] DiTech absorbed Green Tree in a merger effective August 31, 2015.  (Doc. #22-9).

1

(Docs. #30, #31, #29).  CMI and DiTech each filed replies in support of their motions.  (Docs. #32, #33).   These motions were referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  (Doc. #12).

## I.  RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that CMI's Motion for Summary Judgment (**Doc. #18**), DiTech's Motion for Summary Judgment (**Doc. #22**), and MERS' Motion for Judgment on the Pleadings (**Doc. #21**) be **GRANTED**.

## II.  REPORT

### A.  Factual and Procedural Background

Strehle's claims arise out of a $99,450.00 home loan he obtained on March 5, 2003 from Residential Loan Services.  (Doc. #18-2).  To secure repayment of the loan, Strehle granted a mortgage on real property located at 9318 Sherwood Drive in Davisburg, Michigan (the "Mortgage").  (*Id.*).  The Mortgage named MERS as the mortgagee.  (*Id.*).  On March 1, 2004, CMI became the servicer of the Mortgage.  (Doc. #18-3).  As the servicer, CMI became the entity to which Strehle was required to send his monthly Mortgage payments.  (Doc. #18-2 at ¶ 20).  Strehle was notified of this change through a letter dated February 12, 2004.  (Doc. #18-3).  CMI serviced the Mortgage until April 1, 2014, when the servicing was transferred to Green Tree.  (Doc. #18-4).  Strehle was notified of this change in servicing via a letter dated March 17, 2014.  (*Id.*).  He admits that he received notice of this transfer.  (Doc. #18-5 at 13).

Strehle made his monthly Mortgage payments to Green Tree from April 1, 2014 to July 2015.  (Compl. at ¶¶ 13, 14).  However, Strehle abruptly stopped paying Green Tree after July 2015 because he had grown upset with Green Tree's servicing.  (*Id.*).  Strehle found Green Tree to be "incompetent and not professional" because it allegedly failed to properly apply his

payments towards the Mortgage's principal and billed him for expenses which were calculated incorrectly.  (Docs. #29 at 13, #31 at 15-16).  Thus, after more than one year of what Strehle alleges was untenable servicing, he decided to take matters into his own hands.

Starting on August 22, 2015, Strehle began sending his Mortgage payments to CMI – *i.e.*, the entity he knew to be his *former* Mortgage servicer.  (Doc. #18-6).  To several of these payments Strehle attached letters where he explained he was aware CMI was no longer his servicer, but that he had grown so frustrated with Green Tree that he would no longer recognize it as his servicer.  (*Id.* at 24-38).  In the end, Strehle submitted a total of thirteen checks to CMI between August 22, 2015 and April 15, 2016.  (*Id.*).  When CMI received these payments from Strehle, the checks were returned, and CMI sent him a letter stating:  "As you are aware, the servicing of your mortgage account transferred to Green Tree Servicing LLC effective April 1, 2014.  All correspondence relating to the servicing of your mortgage loan should now be directed solely to Green Tree Servicing LLC."  (Doc. #18-7).[2]  Nonetheless, Strehle persisted and continued trying to make payments to CMI, telling them:  "You have two choices:  you can service the contract yourself or you can hire someone else to properly service the contract."  (Doc. #18-6).  Strehle also told CMI:  "[b]ecause you returned my checks after I properly tendered them, I will not pay any penalties, interest, or any other amount arising out of your return of these [] checks . . . it is your fault and not mine that you did not accept it."  (*Id.*).

On November 9, 2015, MERS assigned the Mortgage itself – not merely the servicing – to DiTech, which by this time had absorbed Green Tree.  (Docs. #22-8, #22-9); *see also* note 1.

---

[2] There seems to be some dispute as to whether CMI actually returned all of these checks to Strehle.  (Doc. #30 at 12).  Even assuming this to be the case, it does not change the outcome of this litigation because it is undisputed that CMI did not cash any of these checks, and for the reasons discussed below, Strehle violated his obligations under the Mortgage and Note by sending these checks to CMI rather than Green Tree.

Thus, while DiTech (then operating as Green Tree) became Strehle's *servicer* on April 1, 2014, DiTech also became the *mortgagee* on November 9, 2015.  Accordingly, by November 9, 2015, DiTech was both the Mortgage's servicer and the mortgagee.  (Doc. #22-8).

In late November 2015, Strehle stopped sending checks to CMI and began making his Mortgage payments to DiTech.  (Doc. #1-11 at ¶ 25).  While no new transfers or assignments took place after this date – either in regard to the Mortgage or the servicing – this did not mark the end of Strehle's disagreements arising under the Mortgage.  During the period of time when Strehle had refused to make payments to his assigned servicer, he had been assessed several charges which he believes he was not required to pay.

On August 27, 2015, DiTech (operating as Green Tree in its capacity as the servicer of the Mortgage) became aware that Strehle had overdue property taxes, and that the local assessor had turned over the unpaid taxes to the Oakland County Treasurer for collection. (Doc. #22-6). After disbursing a total of $1,253.36 to the Oakland County Treasurer to cover this expense, DiTech proceeded to notify Strehle that pursuant to the terms of the Mortgage agreement, it would be establishing an escrow account to ensure reimbursement for this amount.  (Doc. #22-5).  DiTech later notified Strehle that his new Mortgage payment was being increased so as to account for the escrow payments which Strehle had to make.  (Doc. #22-7).

However, Strehle believes that he did not have to make the higher Mortgage payment. Though the monthly payment due to DiTech had risen from roughly $700.00 to $777.26, Strehle only paid the amount he believed he owed under the Mortgage, sending checks for $699.10 in November 2015 and for $700.10 in December 2015.  (Docs. #1, #22-7).  These insufficient payments ultimately left Strehle's account past due in the amount of $1,017.94.  (Doc. #22-5 at ¶ 22).  In turn, this triggered an important provision in the Mortgage contract.  (Doc. #22-2 at ¶ 2).

4

Under the Mortgage, DiTech has the right, when the Mortgage is overdue, to accept any payment or partial payment insufficient to bring the loan current, and to hold those funds in an unapplied funds account until the loan is made current.  (*Id.*).  When DiTech did just that, Strehle faulted all of the defendants for their interconnected roles in allegedly creating this dispute.  Specifically, Strehle believes that CMI's refusal to accept his payments was improper, and that because any unpaid expenses were attributable to CMI's inaction, the steps that DiTech subsequently took against him were unjustified.

Despite what appears to be Strehle's confusion over the difference between a claim and remedy, he asserts six counts in his complaint:  Count I) a declaratory judgment that CMI and DiTech cannot withhold applying mortgage payments to the Mortgage's principal and interest, create an escrow account, keep an escrow amount after declaring it terminated, or refuse to collect payments that Strehle made to a previous servicer; Count II) a claim for breach of the Mortgage contract against CMI, DiTech, and MERS[3]; Count III) a claim for negligence against CMI, DiTech, and MERS; Count IV) an accounting by Green Tree only[4]; Count V) a claim against DiTech only for violation of the Fair Credit Reporting Act ("FCRA"), in particular 15 U.S.C. §§ 1681n, 1681o, 1681p, and 1681s-2(a); and Count VI) "respondeat superior/vicarious liability" against MERS only.  (Doc. #1).  As noted above, CMI and DiTech filed motions for

---

[3] Strehle's breach of contract claim against MERS was dismissed pursuant to a stipulated order. (Doc. #23).

[4] In this Count, Strehle alleges that Green Tree erred in its servicing of the Mortgage, and requests that Green Tree "account fully and accurately for all monies paid to it by [him] for his mortgage."  (Compl. at 23-24).  However, in Strehle's response to DiTech/Green Tree's motion for summary judgment, he stated that he "has already received an accounting from Green Tree and will dismiss this count."  (Doc. #31 at 31-32).  Accordingly, the Court recommends dismissal of this count.

summary judgment, and MERS filed a motion for judgment on the pleadings.  (Docs. #18, #21, #22).  Each requested that all of the counts brought against them be dismissed.  (*Id.*).

In its motion, CMI asserts:  1) Count I must be dismissed because declaratory relief is not a valid cause of action; 2) summary judgment should be granted as to Count II because the breach of contract claim against CMI stems from a period of time when CMI was no longer affiliated with Strehle's Mortgage, meaning CMI could not and did not commit a breach; and 3) summary judgment should be granted as to the negligence claim in Count III because CMI did not owe a duty of care outside of the obligations it previously owed under the contract.  (Doc. #18).

In its own summary judgment motion, DiTech makes the same argument as CMI regarding Count I, and asserts that summary judgment should also be granted as to the remaining counts as:  1) DiTech did not breach its contract with Strehle as alleged in Count II given all of its actions were in accord with the contract's express terms, and in any event, Strehle was the first party to breach the contract which bars his claim; 2) Strehle's negligence claim against DiTech alleged in Count III is barred because their relationship was governed exclusively by a contract; and 3) Strehle's FCRA claim in Count V relies on a provision which does not confer a private right of action.  (Doc. #22).

Finally, MERS argues in its motion for judgment on the pleadings that because respondeat superior and vicarious liability are not independent causes of action, Count VI for "respondeat superior/vicarious liability" must be dismissed.  (Doc. #21).

### B.  Applicable Standards

#### 1.  *Summary Judgment Standard Pursuant to Fed. R. Civ. P. 56*

Summary judgment is proper if the moving party shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if a reasonable jury could return a verdict in favor of the nonmoving party, and a fact is "material" if it has the potential to affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Viewing the evidence in a light most favorable to the nonmoving party, the court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once this occurs, the nonmoving party must counter with specific facts upon which a reasonable jury could find in its favor. *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 399 (6th Cir. 2010) (citing *Anderson*, 477 U.S. at 252).  A mere scintilla of proof or some metaphysical doubt as to a material fact is insufficient to forestall summary judgment.  *Sierra Club v. ICG Hazard, LLC*, 781 F.3d 281, 284 (6th Cir. 2015).  "Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Alexander v. Caresource*, 576 F.3d 551, 560 (6th Cir. 2009) (citing *Lewis v. Phillip Morris, Inc*., 355 F.3d 515, 533 (6th Cir. 2004)).

### 2. *Judgment on the Pleadings Standard Pursuant to Fed. R. Civ. P. 12(c)*

Fed. R. Civ. P. 12(c) provides that, "[a]fter the pleadings are closed . . . a party may move for judgment on the pleadings."  A Rule 12(c) motion is designed to provide a means of disposing of cases when the material facts are not in dispute between the parties and judgment on

the merits can be achieved by focusing on the content of the competing pleadings, attached exhibits, matters incorporated into the pleadings, and any facts of which the court may take judicial notice. 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1367 (2009).  For a Rule 12(c) motion, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true and the motion may be granted only of the moving party is nevertheless clearly entitled to judgment. *Tucker v. Middleburg–Legacy Place,* 539 F.3d 545, 549 (6th Cir. 2008).  The court, however, need not accept as true legal conclusions or unwarranted factual inferences. *Barany–Snyder v. Weiner,* 539 F.3d 327, 332 (6th Cir. 2008).  A Rule 12(c) motion is appropriately granted when no material issue of fact exists and the moving party is entitled to judgment as a matter of law. *Tucker,* 539 F.3d at 549.  In this sense, it is similar to a motion under Rule 56(c).

A motion under 12(c) is also analyzed similarly to a motion under Rule 12(b)(6), in that the outcome turns exclusively on the pleadings. *See Id.* at 550; *Sensations, Inc. v. City of Grand Rapids,* 526 F.3d 291, 295 (6th Cir. 2008).  "The manner of review of Fed. R. Civ. P. 12(c) is the same as review under Rule 12(b)(6)." *Jelovsek v. Bredesen*, 545 F.3d 341, 434 (6th Cir. 2008).  Rule 12(b)(6) requires that a complaint "contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) (internal citation omitted).  A "plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice. *Ashcroft v. Iqbal,* 556 U.S. 662, 678-79 (2009).  As is the case when ruling on a motion to dismiss, the Court may consider "documents relating to the note, mortgage,

assignment, loan modification process, and foreclosure that are referenced in the complaint and integral to" a plaintiff's claims. *Gardner v. Quicken Loans, Inc.*, 567 F. App'x 362, 365 (6th Cir. 2014).

### C. Analysis

#### 1. *CMI's Motion for Summary Judgment*

CMI argues in its motion that Count I (declaratory relief) should be dismissed, and that summary judgment should be granted in its favor as to Count II (breach of contract) and Count III (negligence). In each instance, the Court agrees.

##### a.   Count I: Declaratory Relief

CMI argues that Strehle's claim for declaratory relief in Count I "merits dismissal pursuant to Fed. R. Civ. P. 12(c) because declaratory relief is a form of relief, and not a cause of action." (Doc. #18 at 6). In his response, Strehle contends that "[t]he only way to get [declaratory] relief before a court is to put it in a pleading in order to initiate a civil action, as that is the only way for invoking the jurisdiction of the Court." (Doc. #30 at 17). While a party may only be able to obtain declaratory relief by requesting it in a complaint, Strehle's argument does not address the crucial fact that "declaratory relief" is not a claim which can stand on its own.

It is well-settled that "[d]eclaratory relief is a remedy . . . not a claim." *McCann v. U.S. Bank, N.A.*, 873 F. Supp. 2d 823, 848 (E.D. Mich. 2012) (citing *Mettler Walloon, L.L.C. v. Melrose Twp.*, 281 Mich. App. 184, 221 (2008)); *see also Wiggins v. City of Burton*, 291 Mich. App. 532, 561 (2011) ("Although it has become commonplace in this state for a plaintiff to assert a request for declaratory relief as a separately labeled cause of action within his or her complaint, this is technically improper because declaratory relief is a remedy, not a claim."). "Nevertheless, a complaint must be read as a whole, and it is well settled that this Court will look beyond the

mere procedural labels used in the pleadings." *Wiggins*, 291 Mich. App. at 536 (quoting *Adams v. Adams* (on reconsideration), 276 Mich. App. 704, 710-711, 742 N.W.2d 399 (2007).

Under the foregoing case law, Count I against CMI should be dismissed.

### b. Count II: Breach of Contract

In its motion, CMI asserts that summary judgment should be granted as to Count II because it never breached the contract.  (Doc. #18 at 7-9).  It points out that the Mortgage contract permits changes in mortgage servicing, and that there is no dispute that CMI transferred servicing to Green Tree effective April 1, 2014.  (*Id.* at 8).  It argues that because "[Strehle] admitted that the amount he seeks to recover from CMI is the total amount of payments [Strehle] sent to CMI *after* the Service Transfer, and [because Strehle] admits that CMI has not cashed those checks," this claim cannot survive.  (*Id.*).  As such, it asserts Strehle "[did] not have the authority to ignore the binding language in the Mortgage and unilaterally decide that he did not have to comply with the terms of the Mortgage and the Service Transfer."  (*Id.* at 9).  The Court agrees with CMI that after servicing of the Mortgage was transferred to Green Tree, Strehle had no further right to send his payments to CMI, and that his doing so did not reinstate CMI as the servicer of his Mortgage.

When the intent is clear from the express language of a contract, it must be "taken and understood in [its] plain, ordinary, and popular sense."  *Mich. Mut. Ins. Co. v. Dowell*, 204 Mich. App. 81 (1994).  A "contract is to be given its ordinary meaning unless it is apparent from a reading of the whole instrument that a different or special meaning was intended."  *Comerica Bank v. Lexington Ins. Co.*, 3 F.3d 939, 942 (6th Cir. 1993).  "Contract provisions are considered ambiguous when the terms are reasonably and fairly susceptible to multiple understandings and meanings . . . but a contract will not be considered ambiguous solely because the parties disagree

as to the meaning." *Zbiciak v. Herald Co.*, 49 F. App'x 501, 504 (6th Cir. 2002) (internal citations omitted). Similarly, "the bare fact that a plausible argument exists for more than one meaning [does not render the term ambiguous] if we are able to determine the correct meaning of a disputed contract term using common sense and ordinary principles of construction, [and] that is the end of the matter." *Kennedy v. Owosso Grp.*, 134 F.3d 371 (6th Cir. 1998) (internal citations omitted). In the end, whether or not a contract is ambiguous is a question of law properly determined by the court. *City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 585 (6th Cir. 2001).

The pertinent part of the Mortgage agreement reads:

> The note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. **There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made** and any other information [the Real Estate Settlement Procedures Act ("RESPA")] requires in connection with a notice of transfer of servicing.

(Doc. #18-1 at ¶ 20) (emphasis added).

Nothing in the plain language of the Mortgage gave Strehle, the "Borrower," the right to unilaterally decide who would service his Mortgage. Rather, the language makes clear that Strehle was to pay the party who is his designated servicer, meaning that when CMI transferred servicing to Green Tree, Strehle was obligated to send his payments to Green Tree.[5] While Strehle maintains that he "could find no authority in the Code of Federal Regulations, RESPA, or

_____

[5] Strehle admits that he received notice of the transfer from CMI to Green Tree via written correspondence dated March 17, 2014. (Docs. #18-4, #18-5).

the United States Code that prohibits a borrower from terminating a servicer when that servicer is unable to properly service a mortgage for 16 months," this is not surprising.  (Doc. #30 at 14). The Court would not expect him to find any authority which plainly contradicts a straightforward and standard element of most mortgage contracts.  *See, e.g.*, Federal Trade Commission, *Consumer Information: Making Payments to Your Mortgage Servicer*, https://www.consumer.ftc.gov/articles/0190-making-payments-your-mortgage-servicer (last visited April 30, 2018) ("If your loan is transferred to a new servicer, you generally get two notices: one from your current mortgage servicer; the other from the new servicer.").

Strehle attempts to clarify his position in his response brief.  Basically, he believes that after he decided to stop sending payments to Green Tree – and instead send them to CMI, his previous servicer – CMI was required to accept these payments and apply them towards the Mortgage.  (Doc. #30 at 5-8).  Strehle claims that nothing in the Mortgage contract legally prohibits him from terminating a servicer, and that he is free to do so whenever he concludes a servicer is "incompetent and not professional." (*Id.*); (Doc. #31 at 15-16).  He bases this theory on two arguments, which the Court addresses below.

First, Strehle asserts that "there is no . . . provision *requiring* [him] to send payments anywhere but to the mortgagee [MERS]."  (Doc. #30 at 6, 15) (emphasis in original).  Strehle claims he was not required to pay Green Tree because the provision regarding servicing transfers is non-binding and merely "permissive." (*Id.* at 6).  In support of this argument, Strehle focuses on the word "should" in following part of the Mortgage agreement:

> If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments ***should*** be made and any other information RESPA requires in connection with a notice of transfer of servicing.

(Doc. #18-1 at ¶ 20) (emphasis added).

In combination with this provision of the Mortgage, when CMI sent Strehle a similarly-worded letter, Strehle concluded that making payments to an assigned servicer was merely a suggestion which he was free to disregard.   (Doc. #30 at 6 (quoting Doc. #30 at 29-30)).   Strehle's argument finds no support in the relevant documents or the law.

The portion of the Mortgage agreement quoted above specifically references the possibility that the servicer might "change" to a "new" one.  (Doc. #18-1 at ¶ 20).  This makes clear that the "new" servicer *replaces* the old one.   Strehle's argument also fails because it employs a nonsensical use of the term "should"; under Strehle's interpretation, he could elect to send his payment not only to a prior servicer, but to anyone he wished.  *Hastings Mut. Ins. Co. v. Safety King, Inc.*, 286 Mich. App. 287, 297 (2009) ("contract terms should not be considered in isolation and contracts are to be interpreted to avoid absurd or unreasonable conditions and results.").  Finally, the Court notes that CMI's March 17, 2014 letter to Strehle advising him that Green Tree was his new servicer unambiguously specifies when and *to whom* Strehle was *required* to make his Mortgage payments.  (Doc. #18-4).  The letter states in relevant part:

> The servicing of your mortgage loan is being transferred effective April 1, 2014.  This means that after this date a new servicer will be collecting your mortgage loan payments from you.  Nothing else about your mortgage will change.
>
> CitiMortgage, Inc. is now collecting your payments.  CitiMortgage, Inc. will stop accepting payments received from you after March 31, 2014.
>
> Green Tree Servicing LLC will collect your payments going forward.  Your new servicer will start accepting payments received from you on April 1, 2014.
>
> Send all payments due on or after April 1, 2014, to Green Tree Servicing LLC at this address:  P.O. Box 7169, Pasadena, CA  91109-7169.

(*Id.*).  Strehle's argument (Doc. #30 at 21) that this letter confirms his position that he could elect to send his payments to CMI instead of Green Tree clearly lacks merit.  (*Id.*).

In sum, the language in the Mortgage makes clear that the provision requiring payments to be made to the new servicer – Green Tree – was not permissive.  Taken it its plain and ordinary sense, the disputed sentence in the Mortgage cannot mean that Strehle could unilaterally decide to send his payments to CMI rather than Green Tree.

Strehle next argues that while the servicing of his Mortgage was transferred to CMI, CMI was not allowed to subsequently transfer servicing to Green Tree.  (Doc. #30 at 4).  That is, because CMI is not a signatory to the Mortgage contract itself, he avers it had no authority to utilize the portion of the agreement which permits transfers in servicing, as the Mortgage supposedly only permits the mortgagee (in this case MERS), to take such action.  (*Id.*).  Specifically, Strehle contends:

> the mortgage does not provide that a servicer can transfer the servicing rights of the mortgage.  CMI has not identified any provision of the mortgage that contains this right.  Only a principal can do so under the mortgage.  CMI is not mentioned in the mortgage and it never signed it.  Since it is not a party to it any duties it has are established by statute only.

(Doc. #30 at 4).  Essentially, Strehle believes that CMI was required to accept his payments even after it transferred servicing to Green Tree because CMI was not allowed to transfer servicing in the first place.  Strehle again fails to provide any support or authority for this argument.

Contrary to Strehle's assertion that CMI's "role and duties . . . are established by statute only" (*Id.* at 3-4), mortgage servicers *are* bound by the terms of the mortgages to which they are assigned.  A "loan servicer assumes the loan-servicing obligations if the loan is subsequently serviced by a party other than the purchaser of the note."  *Alshaibani v. Litton Loan Servicing, LP*, 528 F. App'x 462, 464 (6th Cir. 2013).  "Under these circumstances, [a mortgage servicer],

as the assuming party, would be bound by the note and mortgage." *Id.*  (citing 6 Am. Jur.2d Assignments § 128 (2013) ("An assignee is subject to the obligations imposed by the contract when he or she assumes those obligations, either expressly or impliedly.")).

In addition, it is clear that a loan servicer is able to enforce the terms of a mortgage contract even if it is not a signatory to the original agreement.  Non-signatory loan servicers have consistently been found to possess standing to enforce the terms of the mortgage agreements which they are affiliated with.  For example, in a case involving a similar mortgage provision permitting service to be transferred, the court held that the provision:

> did not act to prevent the mortgagee from delegating its duties or simply appointing an agent to act in its place.  Further, the servicing of a loan or mortgage is not personal.  In other words, whoever services the loan and mortgage will be of no material consequence to a mortgagor, like defendant [the borrower].  Accordingly, the mere fact that plaintiff was a servicer of the mortgage did not deprive it of standing, as it rightfully was attempting to foreclose on the property, pursuant to a valid delegation.

*PNC Bank v. Goodman*, No. 326687, 2016 WL 3419014, at *4 (Mich. Ct. App. June 21, 2016). *See also GMAC Mortg., LLC v. McKeever*, 651 F. App'x 332, 337 (6th Cir. 2016) (citing *Greer v. O'Dell*, 305 F.3d 1297, 1302 (11th Cir. 2002) ("[T]he sole issue before us is whether a loan servicer is a 'real party in interest' with standing to conduct, through licensed counsel, the legal affairs of the investor relating to the debt that it services.  We answer this question in the affirmative.").  Therefore, the mere fact that CMI was not a signatory to the Mortgage does not mean it lacked the authority to enforce its terms, and Strehle has pointed to nothing in the Mortgage indicating that once the mortgagee changed the loan servicer, any further changes to the loan servicer could only be made by the mortgagee.  Indeed, as noted above, the Mortgage simply states that there "might be one or more changes of the Loan servicer . . . [and if] there is a

change to the Loan Servicer, Borrower will be given written notice of the change . . ."  (Doc. #18-1 at ¶ 20).  As there is no dispute that Strehle received such a notice, his argument fails.[6]

For all of the foregoing reasons, CMI was not bound to accept Strehle's payments after the servicing of his Mortgage had been transferred to Green Tree.  Accordingly, CMI did not commit a breach of contract when it did not accept those payments, and the Court should grant CMI's motion for summary judgment as to Count II of Strehle's complaint.

### c.   Count III: Negligence

CMI makes two arguments in support of its motion for summary judgment as to Count III of Strehle's complaint.  First, it asserts that CMI does not owe Strehle any duty of care outside of the Mortgage because, given the fact that their relationship is governed by contract, no negligence action can be maintained against it.  (Doc. #18 at 19-20).  Second, it contends that because this claim relates to actions which post-dated CMI's role as servicer of Strehle's Mortgage, it cannot be held liable for any acts which allegedly occurred when it was no longer affiliated with the Mortgage.  (*Id.*).

In order to successfully plead a negligence claim, a plaintiff must allege four elements: duty, breach, causation, and damages.  *Lelito v. Monroe*, 273 Mich. App. 416, 418-19 (2006).  Strehle's negligence claim against CMI fails for the same reason several of his other arguments fail:  he is unable to establish that CMI owed any duty to him with respect to the Mortgage after it transferred servicing to Green Tree.  The crux of Strehle's claim seems to be that a*fter* CMI transferred servicing of the Mortgage to Green Tree, CMI had a duty to:  1) accept his checks

---

[6] The Court also notes that while Strehle asserts that only MERS had the ability to transfer servicing of the Mortgage, this ignores the fact that Aurora Loan Services – and not CMI – was the original servicer of Strehle's Mortgage.  (Doc. #18-3) (informing Strehle that "[e]ffective March 1, 2004, your mortgage loan servicing will be transferred from Aurora Loan Services Inc. to CMI").

and not return them; 2) apply those payments to the Mortgage; 3) report to Green Tree that it was holding $2,606.17 of Strehle's money[7]; and 4) report to Green Tree that he "was not in arrears on his mortgage because CMI had not applied to [Strehle's] Mortgage $2,606.17 it was holding." (Compl. at ¶ 73).

The Court agrees with CMI that summary judgment is appropriate as to this claim.  As discussed above, while Strehle believes that CMI became his servicer again once he purportedly "terminated" Green Tree and began sending payments to CMI, this is plainly not the case.  After CMI was no longer the servicer (*i.e.*, after it transferred servicing), it owed no duty – under the contract or otherwise – to Strehle.  *Litchfield v. Garratt*, 10 Mich. 426, 431–32 (1862) ("When a contract has been absolutely assigned . . . it cannot be held to be the assignor's contract, because he neither reaps its benefits nor shares its responsibilities.  He can not be sued upon it . . .").  Indeed, CMI expressly informed Strehle of this at least seven times, and Strehle does not contest that he received all of these notifications.  (Doc. # 18-7 at 2-8).  Further, Strehle's admission that CMI never cashed any of these checks bars him from claiming that they were "holding" this money.  (Doc. #22-3 at 13).

In sum, Strehle failed to raise a material question of fact that CMI owed any duty to him with respect to the Mortgage after its servicing was transferred to Green Tree.  Accordingly, CMI is entitled to summary judgment as to Strehle's negligence claim against it.

### 2.  *DiTech's Motion for Summary Judgment*

Just as CMI did, DiTech argues in its motion that Count I (declaratory relief) should be dismissed, and that summary judgment should be granted in its favor as to Count II (breach of

---

[7] This is one of many contradictory statements made by Strehle.  Though he claims that CMI was "holding" $2,606.17 of [his] money, he responded "true" to an interrogatory that asked him to "[a]dmit that CMI never cashed any checks you sent to CMI after the date the Mortgage was service-transferred from CMI to Greentree."  (Doc. # 22-3 at 13).

contract) and Count III (negligence).  In addition, DiTech asserts that summary judgment should be granted as to Count V (violation of the FCRA).  The Court agrees.

a.  Count I: Declaratory Relief

Just as CMI did, DiTech argues that Strehle's claim for declaratory relief should be dismissed because he "cannot utilize declaratory relief as an independent theory of recovery." (Doc. #22 at 10).  For the same reasons discussed above, this aspect of DiTech's summary judgment motion should be granted.

b.  Count II: Breach of Contract

DiTech argues that it is entitled to summary judgment on Strehle's breach of contract claim because it fully complied with the terms of the Mortgage, and when Strehle "willfully refused to remit his monthly mortgage payments to the authorized servicer for his Mortgage, [he] thereby committ[ed] the first material breach."  (Doc. #22 at 11).  The Court agrees.

Strehle alleges that DiTech breached the Mortgage contract by:  (1) failing to collect the $2,606.17 in checks he attempted to send to CMI; 2) creating an escrow account when they were not affiliated with the Mortgage; and 3) placing payments into an unapplied funds account when there was no basis for doing so.  In regard to its alleged failure to collect Strehle's payments from CMI, DiTech contends Strehle was not allowed to send his payments to anyone but his then-assigned servicer, and was not free to "select his own servicer, 'terminate' his mortgage loan servicer, or force the current servicer to retrieve monthly payments from another servicer of [Strehle's] choosing."  (Doc. #22 at 11).  As to the second and third arguments set forth by Strehle, DiTech asserts it had a clear right under the Mortgage contract to create an escrow account and place a portion of Strehle's payments in an unapplied funds account.  (*Id.*).  That is,

because Strehle's account was overdue and he continued to make incomplete monthly Mortgage payments, their right to take such action under the contract was justified.  (*Id.*).

As an initial matter, DiTech did not commit a breach of contract by not collecting the uncashed checks which Strehle sent to CMI.  As discussed above, Strehle was required to send his payments directly to DiTech during the time it was his assigned servicer.  He was not entitled to make or send payments to CMI in hopes that such funds would be routed through the proper channels and eventually applied to his Mortgage.  DiTech did not breach the contract by not chasing down money that Strehle deliberately sent to an entity who was not the assigned servicer of his Mortgage.

Nor did DiTech's creation of the escrow account constitute a breach of contract. Strehle's argument relies on the already-rejected premise that his unilateral termination of Green Tree's servicing marked the end of Green Tree's involvement in the Mortgage.  Unfortunately for Strehle, his unilateral decision to stop sending payments to his assigned servicer did not change the fact that Green Tree was his servicer – meaning Green Tree remained endowed with the rights set forth in the Mortgage contract.  As DiTech correctly points out, the Escrow Waiver Agreement and Mortgage both allow for escrowed amounts if certain expenses are unpaid.  (Doc. #22 at 14-15).  The Escrow Waiver Agreement, which was signed by Strehle on March 5, 2003 (the day he first obtained his home loan), reads:

> In consideration  of Residential Loan Centers of America or their assignee agreement to waive their normal requirement providing for the escrow of taxes and insurance, the undersigned hereby agree to pay said property taxes and insurance premiums promptly when due and to provide receipts to Residential Loan Centers of America if requested to do so. . . . Failure to pay said taxes or insurance premiums when due or to make monthly mortgage payments as agreed shall give Residential Loan Centers of America the right to reinstate a requirement that property taxes and insurance premiums be placed in escrow and paid monthly for the remaining term of the mortgage.

(Doc. #22-4).  Similarly, the Mortgage itself provides:

> Borrower shall pay Lender the funds for escrow items unless Lender waives Borrower's obligation to pay the funds for any or all escrow items. Lender may waive Borrower's obligation to pay to Lender funds for any or all escrow items at any time.  Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require.  Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9.  If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount.  Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

(Doc. #22-2 at ¶ 3).

It is undisputed that DiTech (then operating as Green Tree) paid certain of Strehle's property taxes, and further, that Strehle was obligated to reimburse it for that payment.  (Docs. #22-6, #31 at 17).  DiTech was permitted to establish an escrow account for this delinquent payment of an escrow item, and it expressly informed Strehle of the creation of the escrow account and the reasons for it.  (Doc. #22-5).  Strehle's argument that an escrow account would have only been warranted if CMI was not in possession of his uncashed checks is of no avail because it was Strehle who improperly sent those checks to an entity that was not his servicer. Thus, DiTech did not breach the Mortgage contract by creating the escrow account.

Nor did DiTech's placement of the partial payments into an unapplied funds account constitute a breach of contract.  Beyond the fact that Strehle refused to acknowledge his new

Mortgage payment amount of $777.26, his account was already overdue at the time of this increase.  (Docs. #22-5, #22-7).  This is important because in making less-than-full payments at a time when his account was not current, the Mortgage contract set forth that in such a situation, DiTech "may accept any payment or partial payment insufficient to bring the loan current . . . [and] may hold such unapplied funds until Borrower makes payment to bring the loan current."  (Doc. #22-2 at ¶ 1).  Thus, the Mortgage makes clear that in the event Strehle's account was not current, partial payments would trigger DiTech's right to do exactly what it did.  (*Id.*).  Moreover, DiTech clearly and promptly informed Strehle of the reasons behind the increase, and explained his options moving forward.  (Doc. #22-5).  For all of these reasons, DiTech's handling of Strehle's payments did not constitute a breach of contract.  Accordingly, DiTech's motion for summary judgment as to Count II should be granted.

c. <u>Count III: Negligence</u>

DiTech argues that summary judgment is warranted as to Strehle's negligence claim in Count III because any obligations and duties DiTech owed to Strehle were already spelled out in the applicable contracts.  (Doc. #22 at 23-24).  They assert that where the relationship between two parties is governed by contract, "there can be no tort liability unless [a] plaintiff alleges and proves the violation of a legal duty separate and distinct from the obligations owed by the defendant under the contract."  (*Id.*).  DiTech concludes that because Strehle "does not assert any allegations against DiTech that are separate and distinct from its contractual obligations under the Note and Mortgage," summary judgment should be granted to it on this Count.  (*Id.*).

In order to successfully plead a negligence claim, a plaintiff must allege four elements: duty, breach, causation, and damages.  *Lelito*, 273 Mich. App. at 418-19.  However, when the parties' relationship is governed by a contract – as is the case between Strehle and DiTech –

there can be no tort liability unless "the defendant owed a duty to the plaintiff that is separate and distinct from the defendant's contractual obligations." *Fultz v. Union-Commerce Assoc.*, 470 Mich. 460, 467 (2004). "If no independent duty exists, no tort based on a contract will lie." *Id.*; *see also Ulrich v. Fed. Land Bank of St. Paul*, 192 Mich. App. 194, 199, (1991) ("It has often been stated that the sometimes hazy distinction between contract and tort actions is made by applying the following rule: if a relation exists that would give rise to a legal duty without enforcing the contract promise itself, the tort action will lie, otherwise it will not." (relying on *Hart v. Ludwig*, 347 Mich. 559, 565 (1956); *Nelson v. Northwestern Savings & Loan Ass'n.*, 146 Mich. App. 505 (1985))).

In his response, Strehle asserts that DiTech owed him several purported duties, including: (1) to "immediately and properly" apply all payments made to it; (2) to refrain from reporting anything to a credit reporting agency; and (3) to collect all monies Strehle had paid to his previous servicer.[8]  Strehle sets forth the basis of these obligations, arguing "DiTech's role and duties as to the mortgage are statutorily imposed and cannot be based upon a contract to which it is not a party." (Doc. #31 at 31).  However, the Court has already rejected Strehle's contention that the various Mortgage servicers' duties were established only by statute and not the Mortgage contract.

---

[8] Strehle alleges that DiTech owed him additional duties, but the Court need not address these duties further because they are based on a rationale the Court has already found to be without merit.  For example, Strehle avers that DiTech "had a duty to acknowledge it had no authority to pay [Strehle's] property taxes from an escrow account which rightfully it had no authority to create." (Compl. at ¶ 86).  However, the Court has previously determined that it did have this authority.  Further, Strehle asserts that Green Tree "had a duty to accurately report to DiTech that it was not the servicer of [Strehle's] mortgage after August 1, 2015" (*i.e.*, the date when Strehle purportedly terminated Green Tree's servicing).  (Compl. at ¶ 95).  But the Court has already determined that Strehle's decision to send his payments to CMI did not negate Green Tree's status as the servicer of his Mortgage.

Here, Strehle has failed to demonstrate how the duties which DiTech allegedly owed him are separate and distinct from the obligations set forth in the Mortgage contract.  The duties which he mentions simply refer to the fact that payments should be processed and applied to one's mortgage account in accord with certain rules.  The contract clearly outlines and mandates performance of these requirements.  (Doc. #22-2 at ¶¶ 3-4).  Of course, DiTech was bound to honor these obligations, and if Strehle could show a material question of fact that DiTech failed to do so, he could maintain a breach of contract action against it.  *See Alshaibani,* 528 F. App'x at 464 (holding that a "loan servicer assumes the loan-servicing obligations if the loan is subsequently serviced by a party other than the purchaser of the note . . . . Under these circumstances, [a mortgage servicer], as the assuming party, would be bound by the note and mortgage."); 6 Am. Jur.2d Assignments § 128 (2013) ("An assignee is subject to the obligations imposed by the contract when he or she assumes those obligations, either expressly or impliedly.").  As discussed above, though, Strehle failed to make such a showing.

Because DiTech did not owe Strehle a duty of care separate and distinct from the obligations set forth in the Mortgage contract, summary judgment should be granted as to Strehle's negligence claim against DiTech.

### d.  Count V: Violation of the FCRA

DiTech next argues that Strehle failed to set forth a sufficient factual basis for relief under the FCRA.  (Doc. #22 at 20).  More specifically, it argues that Strehle's FCRA claims rely on § 1681s-2(a), which does not afford a private right of action.  (*Id.*).  The Court agrees.

In Count V, Strehle alleges that DiTech violated the following specific sections of the FCRA: 15 U.S.C. §§ 1681n, 1681o, 1681p, and 1681s-2(a).[9]  (Compl. at ¶ 122).  Strehle states that after obtaining a copy of his credit report, he discovered DiTech had published that he was in arrears on his Mortgage, which he believes was unwarranted.  (*Id.* at ¶¶ 114-123).  He asserts "DiTech knew or should have known that [he] was not in arrears on his mortgage as DiTech was aware that CMI had in its possession $2,606.17 which it had not applied to [his] mortgage and which DiTech had not retrieved from CMI."  (*Id.* at ¶ 118).  Strehle states that by sending, publishing, and affirming "false information" which it knew or should have known to be false, DiTech's actions amount to violations of the aforementioned FCRA statutes.  Strehle alleges that DiTech's actions damaged his credit, and increased the amount of his Mortgage payments, and he asks for punitive damages as well as costs and attorney's fees.  (*Id.* at ¶ 124).

The FCRA is designed to accomplish two goals:  "to promote efficiency in the Nation's banking system and to protect consumer privacy."  *TRW Inc. v. Andrews*, 534 U.S. 19, 23 (2001); *see also* 15 U.S.C. § 1681(a)(4).  In pursuing this goal, the FCRA regulates the permissible uses of "consumer reports," which summarize credit history and credit worthiness and, through certain of its provisions, creates a private right of action allowing injured consumers to recover for willful and negligent violations.  *See* 15 U.S.C. §§ 1681n (willful violations), 1681o (negligent violations).

---

[9] Of the provisions relied upon by Strehle, only 15 U.S.C. § 1681s-2(a) *potentially* gives rise to an independent claim for relief.  Section 1681s-2(a) defines the "[r]esponsibilities of furnishers of information to consumer reporting agencies" under the FCRA.  In turn, Sections 1681n and 1681o define the damages a plaintiff could obtain for a "willful" (§ 1681n) or "negligent" (§ 1681o) violation of the FCRA.  But Sections 1681n and 1681o do not impose any independent duty on such "furnishers."  And, 15 U.S.C. § 1681p, entitled "Jurisdiction of courts; limitations of actions," is merely a jurisdictional provision of the FCRA which provides the applicable statute of limitations for claims under Subchapter III of the FCRA.

However, an important limitation applies to this private right of action, one which Strehle's complaint cannot overcome; the FCRA expressly prohibits any private cause of action based on a violation of § 1681s–2(a). *See* § 1681s–2(c) ("Sections 1681n and 1681o of this title do not apply to any violation of . . . subsection (a) of [§ 1681s-2].");  20 A.L.R. Fed. 2d 509 (originally published in 2007) ("Although §§ 1681n and 1681o both impose liability upon a violator of any requirement of the FCRA, as numerous courts have noted, another FCRA provision, expressly states that §§ 1681n and 1681o do not apply to violations of 15 U.S.C.A. § 1681s-2(a)."); *Farris v. Morgan Stanley Dean Witter Credit Corp.*, No. 08-CV-11851, 2010 WL 3023808, at *4 (E.D. Mich. July 29, 2010) ("There is no private cause of action for consumers against furnishers of information for failure to comply with § 1681 s–2(a).").  Because no private right of action exists under § 1681s-2(a), DiTech is entitled to summary judgment on Strehle's FCRA claim.

In his response to DiTech's motion for summary judgment, Strehle admits that he did not assert a claim under 15 U.S.C. § 1681s–2(b), which does provide for a private right of action. (Doc. #31 at 21); *see also Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 616-18 (6th Cir. 2012).[10]  Strehle then claims that he "can cure this defect," proceeds to quote 15 U.S.C. § 1681s–

---

[10] Sections 1681s-2(a) and (b) are distinguishable from one another in an important respect. Under the former, a violation can occur by the mere furnishing of information to credit reporting agencies, whereas the latter only "applies to a data furnisher's actions after being placed on notice by a consumer rating agency of a dispute and the existence of an informational error is confirmed." *Damiani v. Wells Fargo*, No. 16-CV-8484 (PGS), 2018 WL 1731347, at *7 (D.N.J. Apr. 10, 2018).  Congress limited enforcement of § 1681s–2(a) violations to certain federal agencies because it "did not want furnishers of credit information exposed to suit by any and every consumer dissatisfied with the credit information furnished." *Morgan v. Ocwen Loan Servicing, LLC*, No. 16-cv-02536, 2018 WL 1796292, at *2 (D. Nev. Apr. 16, 2018) (quoting *Nelson v. Chase Manhattan Mortgage Corp.*, 282 F.3d 1057, 1060 (9th Cir. 2002)).  Violations of 1681s-2(b), on the other hand, may be redressed through a private right of action. *Id.*

2(b), and sets forth an argument as though his response to DiTech's motion for summary judgment were his complaint. (Doc. #31 at 21). Strehle's approach fails in multiple respects.

As DiTech correctly points out, "any request for leave to amend must be brought in the form of a timely motion pursuant to Federal Rule 15." (Doc. #33 at 6) (citing Fed. R. Civ. P. 15). Strehle, an attorney representing himself in this matter, has not filed any such motion for leave to amend his complaint. Accordingly, the Court could enter summary judgment on this basis alone. And, even construing Strehle's filing as a motion for leave to amend, the outcome would be the same. Fed. R. Civ. P. 15(a)(2) states that "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." However, courts should deny a motion to amend "if the amendment is brought in bad faith, for dilatory purposes, results in undue delay or prejudice to the opposing party or would be futile." *Crawford v. Roane*, 53 F.3d 750, 753 (6th Cir. 1995) (citing cases). "A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000) (citing *Thiokol Corp. v. Dep't of Treasury, State of Mich., Revenue Div.*, 987 F.2d 376, 382-83 (6th Cir. 1993)). Here, Strehle's proposed amendment is futile as it still rests on the flawed premise that he was not in arrears on his mortgage because he sent the payments in question to CMI.

For all of these reasons DiTech is entitled to summary judgment on Strehle's FCRA claim.

### 3. *MERS' Motion for Judgment on the Pleadings*

In MERS' motion, it argues that "[s]ince respondeat superior is not a cause of action, Count VI of [Strehle's] complaint is subject to dismissal." (Doc. #21 at 8). Moreover, it asserts

26

that "assuming respondeat superior could even be a basis for liability in this case," Strehle has not established MERS' liability under such a theory. (*Id.* at 8-11).

The Court agrees that there is no independent cause of action for "respondeat superior" or "vicarious liability." *360 Constr. Co. v. Atsalis Bros. Painting Co.*, 915 F. Supp. 2d 883, 894 (E.D. Mich. 2012) (holding "there is no independent cause of action for respondeat superior"). Accordingly, the Court should grant MERS' summary judgment motion as to Count VI of Strehle's complaint.

## III. CONCLUSION

For the reasons stated above, **IT IS RECOMMENDED** that CMI's Motion for Summary Judgment **(Doc. #18)**, DiTech's Motion for Summary Judgment **(Doc. #22)**, and MERS' Motion for Judgment on the Pleadings **(Doc. #21)** be **GRANTED**.

Dated: April 30, 2018                                    s/ David R. Grand
Ann Arbor, Michigan                                 DAVID R. GRAND
                                                             United States Magistrate Judge

### NOTICE REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(a) and (b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Order and Report and Recommendation. *Willis v. Sec'y of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).

Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.  A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 30, 2018.

/s/ Eddrey O. Butts
EDDREY O. BUTTS
Case Manager